# EDGAR ALLEN ANDERSON *v.* HELEN MUMBERT ANDERSON

[No. 97, September Term, 1978.]

*Decided July 23, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE and DAVIDSON, JJ.

*Harvey M. Katz,* with whom was *Jayson Amster* on the brief, for appellant.

*Frank P. Flury* for appellee.

COLE, J., delivered the opinion of the Court.

In this case we must determine whether, and to what extent, federal civil service annuity payments are subject to garnishment to satisfy a money judgment for spousal support.

On May 27, 1968 Edgar Anderson and Helen Anderson, his wife, executed a "Separation and Property Settlement Agreement" which provided that the

> [h]usband shall pay directly unto the wife, until such time as she remarries, or until the death of either party, the sum of Two Hundred Five Dollars ($205.00) per month as alimony with the first payment being due and payable on the 1st day of July, 1968

and that

> [i]f the husband or wife shall hereafter apply for divorce and the court shall grant the same, this Agreement shall be submitted to the court for approval. If it is approved by the court, the terms thereof shall be incorporated in the decree of divorce and operate as final determination of the property rights of the parties.

The Circuit Court for Prince George's County divorced Edgar *a vinculo matrimonii* from Helen on March 8, 1970 and

referred to the 1968 separation agreement in its decree: "ORDERED), that the agreement between the parties with respect to support, custody of children and property disposition be and the same hereby is approved . . . ."

On November 3, 1975 Helen filed a petition in the circuit court praying that Edgar be held in contempt for failure to make the payments designated in the separation agreement. The court entered an order in July, 1976 stating that the separation agreement "is a valid and binding contractual agreement," but that it was not enforceable by contempt because the agreement was not incorporated into the March 18, 1970 final decree and because the support payments specified in the agreement "do . . . not constitute technical alimony." Nevertheless, judgment was entered against Edgar "in the amount of Fifty Six Hundred and Thirty Five Dollars ($5,635.00) for all monies due to Helen Anderson . . . under said Agreement as of June 1, 1976 . . . ."

Helen then sought to enforce this judgment by instituting a garnishment action in the circuit court against the United States Civil Service Commission as garnishee (garnishee). On October 28, 1977 the garnishee answered that Edgar was currently a civil service annuitant with a disposable monthly annuity of $1,064.36 subject to garnishment, but that only 55% of Edgar's November 1, 1977 annuity check could ultimately be garnished. The matter was referred to the Master for Domestic Relations Causes, who recommended that the garnishee's position be adopted and that the court order the garnishee to pay Helen the amount of $588.40.

The case came before the circuit court again on Edgar's exceptions to the Master's report. The circuit court held that Edgar's civil service annuity payments were subject to garnishment, "but according to Maryland procedures only to the extent of 25% of their amount." The court ruled that the support payments owed by Edgar do not constitute "alimony" under Maryland law, but that they do qualify as "alimony" under the federal definition of that term in 42 U.S.C. § 662 (c) (1977) and thus may be garnished under 42 U.S.C. § 659 (1975 and Supp. 1978). The court also ruled that the Maryland statute on attachment of wages, Maryland Code (1975),

§ 15-602 of the Commercial Law Article governs this case because it allows for less extensive garnishment of wages than the maximum permissible amount under federal law, 15 U.S.C. § 1673 (a) (1) or (b) (1968 & Supp. 1978) and 15 U.S.C. § 1677 (1968). Accordingly, the court ordered the garnishee to pay $266.09 to Helen. Edgar promptly noted an appeal from this decision to the Court of Special Appeals.

Helen then asked the circuit court to place a lien on Edgar's earnings. The court denied her petition because the support provision in their separation agreement had not been made part of any court order. Helen then filed a notice of appeal to the Court of Special Appeals. By order of the circuit court Edgar and Helen's appeals were consolidated. While the case was pending before the Court of Special Appeals this Court issued a writ of certiorari to consider whether the circuit court properly held that 25% of Edgar's federal annuity payments is subject to garnishment as a means of enforcement of his legal obligation to support Helen.

Edgar contends that 42 U.S.C. § 659 waives the sovereign immunity of the United States only with regard to garnishment orders issued to enforce obligations to pay "alimony" as defined by state law. Since neither party ever appealed from the circuit court finding that under Maryland law the payments in this case were not technically "alimony", Edgar asserts that his annuity payments are not subject to garnishment under federal law.

Helen, on the other hand, argues that the United States government has waived its sovereign immunity to garnishment of its employees' earnings in 42 U.S.C. § 659 (a) and that the 1970 and 1976 circuit court decrees created a legal obligation which does fall within the definition of "alimony" in the first portion of 42 U.S.C. § 662 (c). She interprets the first portion of § 662 (c) as totally independent of state law.

As we view this case, its resolution depends upon our answers to two questions: first, whether federal annuity payments may be garnished to satisfy a legal obligation to support a former spouse, and, second, if these payments are subject to garnishment, whether they are attachable to

the extent indicated by the circuit court. Our review of these issues leads us to the conclusion that the circuit court committed no error. We shall affirm its decision.

With regard to the first question, we believe that the federal government has waived its immunity to garnishment of monies payable by the United States which would satisfy legal obligations of federal employees to make alimony payments. During Congressional consideration of the Social Services Amendments of 1974, P.L. 93-647, the Senate Finance Committee made the following report on attachment of federal wages:

> State officials have recommended that legislation be enacted permitting garnishment and attachment of Federal wages and other obligations (such as income tax refunds) where a support order or judgment exists. At the present time, the pay of Federal employees, including military personnel, is not subject to attachment for purposes of enforcing court orders, including orders for child support or alimony. The basis for this exemption is apparently a finding by the courts that the attachment procedure involves the immunity of the United States from suits to which it has not consented.

> \* \* \*

> The Committee bill would specifically provide that the wages of Federal employees, including military personnel, would be subject to garnishment in support and alimony cases. In addition, annuities and other payments under Federal programs in which entitlement is based on employment would also be subject to attachment for support and alimony payments. This provision would be applicable whether or not the family upon whose behalf the proceeding is brought is on the welfare rolls. It would also override provisions in various social insurance .or retirement statutes which prohibit attachment or garnishment. [S. Rep. No. 93-1356,

93rd Cong., 2nd Sess., reprinted in [1974] U.S. Code Cong. & Ad. News 8157].

Section 659 (a) of Title 42 of the United States Code, originally enacted as part of these Social Services Amendments, implements the objectives stated in the Senate report. This provision explicitly waives the immunity of the federal government to garnishment in satisfaction of a legal obligation to make alimony payments:

> § 659. Enforcement of individual's legal obligations to provide child support or make alimony payments — United States and District of Columbia to be subject to legal process
>
> (a) Notwithstanding any other provision of law, effective January 1, 1975, moneys (the entitlement to which is based upon remuneration for employment) due from, or payable by, the United States or the District of Columbia (including any agency, subdivision, or instrumentality thereof) to any individual, including members of the armed services, shall be subject, in like manner and to the same extent as if the United States or the District of Columbia were a private person, to legal process brought for the enforcement, against such individual of his legal obligations to provide child support or *make alimony payments.* [42 U.S.C. § 659 (a) (1975) (originally enacted as Act of August 14, 1935, ch. 531, Title IV, § 459), *as added by* Social Services Amendments of 1974, Pub.L. No. 93-647, § 101 (a), 88 Stat. 2357, *as amended by* Act of May 23, 1977, Pub.L. No. 95-30, Title V, § 501 (a), 91 Stat. 157 (emphasis supplied)].

Neither party disputes the obvious effect of the waiver language in § 659 (a). Many courts have recognized that the provisions of § 659 embodied a Congressional intent to remove federal immunity from state garnishment orders in fulfillment of legal obligations to provide alimony and child support. *See Beneficial Finance Co. of New York, Inc. v.*

*Dallas,* 571 F. 2d 125 (2d Cir. 1978); *Murray v. Murray,* 558 F. 2d 1340 (8th Cir. 1977); *Enfinger v. Enfinger,* 452 F. Supp. 553 (M.D. Ga. 1978); *Kelley v. Kelley,* 425 F. Supp. 181 (W.D. La. 1977); *Wilhelm v. U.S. Dept. of Air Force Accounting, Etc.,* 418 F. Supp. 162 (S.D. Tex. 1976); *Popple v. United States,* 416 F. Supp. 1227 (W.D.N.Y. 1976); *Iowa-Des Moines Nat. Bank v. United States,* 414 F. Supp. 1393 (S.D. Iowa 1976); *Golightly v. Golightly,* 410 F. Supp. 861 (D. Neb. 1976); *Morrison v. Morrison,* 408 F. Supp. 315 (N.D. Tex. 1976); *Bolling v. Howland,* 398 F. Supp. 1313 (M.D. Tenn. 1975); *Elmwood v. Elmwood,* 295 N.C. 168, 244 S.E.2d 668 (1978). The point of contention here is, rather, whether Edgar's obligation to make support payments to Helen constitutes "alimony" within the context of § 659 (a).

Fortunately the Congress subsequently sought to clarify the meaning of the term "alimony" in § 659 (a) by enacting 42 U.S.C. § 622 (c) in 1977. Section 662 (c) contains the following explanatory language:

For purposes of section 659 of this title —

\* \* \*

(c) The term "alimony", when used in reference to the legal obligations of an individual to provide the same, *means periodic payments of funds for the support and maintenance of the spouse (or former spouse) of such individual,* and (subject to and in accordance with State law) includes but is not limited to, separate maintenance, alimony pendente lite, maintenance, and spousal support; such term also includes attorney's fees, interest, and court costs when and to the extent that the same are expressly made recoverable as such pursuant to a decree, order, or judgment issued in accordance with applicable State law by a court of competent jurisdiction. Such term does not include any payment or transfer of property or its value by an individual to his spouse or former spouse in compliance with any community property settlement, equitable distribution of property, or other division of property

between spouses or former spouses. [42 U.S.C. § 662 (1977) (originally enacted as Act of August 14, 1935, ch. 531, Title IV, § 462, *as added by* Act of May 23, 1977, Pub.L. No. 95-30, Title V, § 501 (d), 91 Stat. 159 (emphasis supplied)].

Applying this definition to the facts before us, we believe that Edgar's obligation falls within the phrase "periodic payments of funds for the support and maintenance of the spouse (or former spouse) of such individual." The circuit court adjudged that Edgar has a "valid and binding" contractual duty to pay monthly support payments to Helen. Further, we agree with the circuit court that this portion of § 662 (c) operates independently of state law. Only that portion of the first sentence of § 662 (c) which follows the parenthetical phrase "(subject to and in accordance with state law)" is limited by state law. The first portion of the first sentence of § 662 (c), which we have underlined for emphasis, contains no reference to state law. It must be construed as a broad generic definition of the term "alimony" which is applicable to this case notwithstanding the circuit court's ruling that its July, 1976 order was not technically a directive to pay "alimony" as defined by Maryland law.

We believe that the Congress intended that its waiver of immunity to garnishment should include the satisfaction of obligations which are in the nature of alimony. To this end, the federal government has adopted its own definition of "alimony" in the first portion of § 662 (c) which is applicable to the instant case. If Congress had wanted to make its definition of "alimony" subject to state law, it could have very easily done so. Instead, only the second portion of the first sentence in § 662 (c) was made subject to that limitation. As the appellee suggests, the second clause may be viewed as expanding the relief afforded to include instances where state law provides for technical causes of action such as "separate maintenance," "alimony pendente lite," "maintenance," and "spousal support." Thus we agree with the circuit court's interpretation of §§ 659 (a) and 662 (c) as permitting the garnishment by Helen of the federal annuity payments due to Edgar.

The three cases cited by Edgar in support of his argument that state law entirely controls the disposition of the instant appeal are inapposite. *Diaz v. Diaz,* 568 F. 2d 1061 (4th Cir. 1977), involved an allegation by Naomi Diaz that 42 U.S.C. § 659 creates a cause of action for garnishment of her former husband's federal retirement and disability benefits for child support and alimony although she had not obtained a state court decree establishing his legal obligation to her. The court held that 42 U.S.C. § 659 did not create a new federal cause of action, nor did it confer any further jurisdiction on federal courts. According to the court, the statute only provided for garnishment against the United States *after* a state court determination of the existence and extent of a legal obligation to pay. The court ruled that abstention was the proper course of action in these circumstances. The *Diaz* case differs from the instant facts, where a Maryland circuit court has already determined that a legal obligation to make support payments exists.

*Overman v. United States,* 563 F. 2d 1287 (8th Cir. 1977), is also not on point. In this case, a man defended against his former wife's garnishment action under 42 U.S.C. § 659 by challenging the validity of the state court decree which divorced them. The court held that it would not entertain the case because the federal statute was being used as a bootstrap for a dispute based on state domestic relations law. The *Overman* case is distinguishable because the facts in the instant case do not involve any challenge to the validity of the divorce decree.

*Mills v. C.I.R.,* 442 F. 2d 1149 (10th Cir. 1971), is cited by Edgar for the proposition that the federal statutory term "alimony" is intended to mean alimony as defined by state law. The *Mills* case has no bearing on our present decision. It involved a challenge to the Internal Revenue Service's assessment of federal income tax deficiencies against a formerly married couple who had treated a property division agreement between them as alimony payments under the Internal Revenue Code, deductible from the husband's income. The issue before the court was whether the division of property was indeed alimony or a property settlement,

which would not be deductible by the husband. The *Mills* decision did not involve garnishment. Nor did it entail any analysis as to whether a federal or state definition of alimony was controlling, for this case antedated the enactment of both 42 U.S.C. § 659 (a) and § 662 (c). Our review of the statutory and case law convinces us of the soundness of the circuit court's conclusion that Edgar's annuity payments are subject to garnishment by Helen.

We now proceed to determine the proper extent of such garnishment. Both the Congress and the Maryland General Assembly have passed statutes imposing limitations on garnishment of wages.

On May 29, 1968 Congress enacted the Consumer Credit Protection Act, 15 U.S.C. §§ 1671-77. One of the purposes of this Act was to strike a balance between the needs of creditors, who favored liberal wage garnishment, and the needs of debtors, whose financial problems were leading to growing numbers of defaults, non-business bankruptcies and loss of jobs. *See* H. Rep. No. 1040, 90th Cong., 2nd Sess., reprinted in [1968] U.S. Code Cong. & Ad. News 1962-67; Moran, *Relief for the Wage Earner: Regulation of Garnishment Under Title III of the Consumer Credit Protection Act,* 12 *B.C. Indus. & Com. L.Rev.* 101 (1970); *Note, Wage Garnishment Under the Consumer Credit Protection Act: An Examination of the Effects on Existing State Law,* 12 Wm. & Mary L.Rev. 357 (1970). Section 1673 of Title 15 of the United States Code, which sets forth the maximum allowable garnishment of federal earnings, has been interpreted by the courts as designed to protect debtors. *E.g., In re Kokoszka,* 479 F. 2d 990 (2d Cir. 1973), *aff'd sub nom. Kokoszka v. Belford,* 417 U. S. 642, 94 S. Ct. 2431, 41 L.Ed.2d 374 (1974); *United States v. Dumont,* 416 F. Supp. 632 (D. Mont. 1976); *Hodgson v. Christopher,* 365 F. Supp. 583 (D. N.D. 1973); *see generally* Annot., 14 A.L.R. Fed. 447 (1973). It reads in pertinent part:

> § 1673. Restriction on garnishment — Maximum allowable garnishment
>
> (a) Except as provided in subsection (b) of this section and in section 1675 of this title, the maximum

part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment may not exceed

(1) 25 per centum of his disposable earnings for that week, or

\* \* \*

(b) (1) The restrictions of subsection (a) of this section do not apply in the case of

(A) any order for the support of any person issued by a court of competent jurisdiction or in accordance with an administrative procedure, which is established by State law, which affords substantial due process, and which is subject to judicial review.

Section 1677 of Title 15 of the United States Code establishes a rule for construction of § 1673 along with state laws limiting garnishment:

§ 1677. Effect on State laws

This subchapter does not annul, alter, or affect, or exempt any person from complying with, the laws of any State

(1) prohibiting garnishments or providing for more limited garnishments than are allowed under this subchapter . . . .

This section has been uniformly interpreted by the courts as setting forth the rule that where a state and the federal government have both enacted provisions which limit garnishment of wages, the statute which protects a greater amount of a debtor's earnings from garnishment will be controlling. Federal law will only preempt state law where the latter allows a greater amount of a debtor's earnings to be reached than does federal law, thus frustrating the purposes of the Consumer Credit Protection Act. *See Evans v. Evans,* 429 F. Supp. 580 (W.D. Okla. 1976); *Crane v. Crane,* 417 F. Supp. 38 (E.D. Okla. 1976); *United States v. Dumont, supra; Samples v. Samples,* 414 F. Supp. 773 (W.D. Okla. 1976);

*Hodgson v. Hamilton Municipal Court,* 349 F. Supp. 1125 (S.D. Ohio 1972); *Hodgson v. Cleveland Municipal Court,* 326 F. Supp. 419 (N.D. Ohio 1971); *First Nat. Bank of Denver v. Columbia Credit Corp.,* 499 P. 2d 1163 (Colo. 1972); *Phillips v. General Finance Corporation of Florida,* 297 So.2d 6 (Fla. 1974); *State National Bank v. Fryman,* 27 Ohio Misc. 12, 272 N.E.2d 217 (1971); *Sears, Roebuck & Co. v. A.T. & G. Co., Inc.,* 66 Mich. App. 359, 239 N.W.2d 614 (1976); *Willhite v. Willhite,* 546 P. 2d 612 (Okla. 1976).

The Maryland Code contains a provision prescribing the amount of wages subject to attachment. "Wages" are defined by Maryland Code (1975), § 15-601 of the Commercial Law Article as "all monetary remuneration paid to any employee for his employment." [1] Section 15-602 sets forth the Maryland rule concerning the extent of attachment. The Maryland statute, § 15-602, exempts from attachment at least 75% of wages. The federal statute, 15 U.S.C. § 1673, would exempt either 75% of earnings under subsection (a) (1) or 45% of earnings under subsection (b) (2). Without expressing any opinion as to whether subsection (a) (1) or (b) (2) of the federal statute is applicable, it is apparent that Maryland law provides for less extensive garnishment of wages than either subsection of the federal law. Applying the rule that state law will be preempted only where it provides for more extensive garnishment than federal law, we agree with the circuit court that the Maryland statute is controlling. We therefore affirm the circuit court's holding that 25% of Edgar's annuity payments is subject to garnishment by Helen.

> *Judgment of the Circuit Court for Prince George's County affirmed; costs to be paid by the appellant.*

---

1. This Court has recently discussed the term "wages" within the meaning of §§ 15-601, 15-602 of the Commercial Law Article in Pope v. Pope, 283 Md. 531, 390 A. 2d 1128 (1978); United States v. Williams, 279 Md. 673, 370 A. 2d 1134 (1977).

COMPTROLLER OF THE TREASURY *v.* JOHN C.
LOUIS COMPANY, INC., ET AL.

[No. 93, September Term, 1978.]

*Decided July 24, 1979.*

528

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE and DAVIDSON, JJ.

*Paul S. Sugar, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellant.

*Paul E. Burke, Jr.,* with whom were *McKenney, Thomsen & Burke* on the brief, for John C. Louis Company, Inc. et al., part of appellees. *Donald F. Burke,* with whom were *Cable, McDaniel, Bowie & Bond* on the brief, for McClung-Logan Equipment Co., Inc., other appellee.

DAVIDSON, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH, J., dissent and SMITH, J., filed a dissenting opinion in which MURPHY, C. J., concurs at page 548 *infra.*

The Maryland Retail Sales Tax Act (Act), Md. Ann. Code art. 81, § 324 (i) (1957, 1975 Repl. Vol.), provides in pertinent part:

> " *'Price' means the aggregate value* in money of any thing or things *paid or delivered,* or promised to be paid or delivered *by a purchaser to a vendor in the consummation and complete performance of a retail sale* without any deduction therefrom on account of the cost of the property sold, cost of materials used, labor or service cost, or any other expense whatsoever. *'Price' shall not include the following:*
>
> . . .
>
> "(4) *The amount paid by any purchaser on account of any bona fide freight, delivery and other*

*transportation charges in connection with any sale of tangible personal property if said freight, delivery or other transportation charges are stated or shown as a separate item from the price of the tangible personal property transferred in the retail sale."* (Emphasis added.) [1]

The question here is whether a retail seller of tangible personal property, subject to a sales tax under the Act, can exclude from the price upon which that tax is computed ("price") a charge for delivering the property from the supplier or manufacturer (supplier) to the retail seller, if that charge is separately stated. In other words, the question is whether the retail seller is required to collect and the buyer is required to pay a tax upon such a charge. We here hold that under certain circumstances the retail seller may exclude such a charge from "price," and need not collect a tax on the amount of such a charge.

The appellees, John C. Louis Company, Inc., Chesapeake Supply & Equipment Co., Chesapeake Supply & Equipment Corp., I-R Equipment Corporation, General Supply and Equipment Co., Inc., Lutherville Supply and Equipment Co., Inc., and McClung-Logan Equipment Co., Inc. (retail sellers), are each, insofar as here relevant, retail sellers of heavy construction equipment such as cranes, earthmovers, bulldozers, loaders, and graders. During 1973 and 1974, for the first time since the enactment of the Act in 1947, the appellant, Comptroller of the Treasury (Comptroller), levied assessments against these retail sellers for uncollected and unpaid sales taxes on charges for delivery from the supplier

---

1. On 29 May 1979, art. 81, § 324 (i) (4) was amended by ch. 713, § 1, Acts of 1979, effective 1 July 1979, which provides:

*" 'Price' shall not include the following:*

. . .

"The amount paid by any purchaser on account of any bona fide freight, delivery and other transportation charges in connection with *the retail* sale of *any* tangible personal property *delivered by the vendor, or by a third party acting on behalf of the vendor, directly to the purchaser* if said freight, delivery or other transportation charges are stated or shown as a separate item from the price of the tangible personal property transferred in the retail sale." (Emphasis added.)

to the retail seller. A hearing examiner, Bernard Moan, denied claims for a refund. The retail sellers appealed to the Maryland Tax Court (tax court).

In the tax court, these retail sellers presented detailed evidence to show the customs, usage, and practices prevailing within their industry. Ordinarily, such retail sellers do not keep large pieces of equipment in inventory. Those few items bought to be carried in inventory are, of course, delivered by the supplier to the retail seller before the sale. The retail seller, in turn, delivers the equipment to the buyer after the sale.

The bulk of the equipment sold by such retail sellers, however, is specially ordered for a particular buyer in accordance with that buyer's specifications. Such specially ordered equipment is sometimes delivered from the supplier directly to the buyer's job site. On other occasions, such as when the equipment needs cleaning and servicing before delivery, or arrives in the area at a time when the buyer's job site is shut down, it is delivered to the retail seller, who, often on the very next morning, delivers it to the buyer.

Before 1973, such retail sellers customarily had stated the charge for delivery of such equipment from the supplier separately from the "price" and had not collected sales tax on the amount of such charges. This had been the accepted, customary practice whether the equipment was bought for inventory or specially ordered for a particular buyer and whether the equipment was delivered from the supplier to the retail seller, who in turn delivered it to the buyer, or was delivered from the supplier directly to the buyer.

Various practices were followed in stating the amount of the delivery charge. General Supply and Equipment Co., Inc., Chesapeake Supply & Equipment Co., and Chesapeake Supply & Equipment Corp. stated as the amount of the delivery charge the amount of the delivery cost actually incurred. John C. Louis Company, Inc. stated the amount of the delivery charge which appeared in the contract made at the time of the sale. In approximately 10 per cent of its sales, the delivery cost actually incurred differed from the amount of the delivery charge stated in the contract. When the

contract amount exceeded the delivery cost actually incurred, the buyer would pay the contract amount and the retail seller would pay the excess. When the contract amount was less than the delivery cost actually incurred, the amount paid by the buyer would be reduced. McClung-Logan Equipment Co., Inc. stated an amount for "freight and delivery" in the contract made at the time of sale. "Freight and delivery" included a charge for delivery incurred for delivery from the supplier to the retail seller and a charge for delivery incurred for delivery from the retail seller to the buyer. The buyer would pay the contract amount whether it exceeded or was less than the amount of the delivery cost actually incurred. Lutherville Supply and Equipment Co., Inc. stated an amount for "freight and handling" which was approximately two times the amount of the delivery cost actually incurred. The record contains no evidence to show the practice followed by I-R Equipment Corporation in stating the amount of delivery charges.

The appellees are also retail sellers of small pieces of equipment and replacement parts for large pieces of equipment. Ordinarily, these items are sold from inventory. Each of these items, however, bears a different serial number and a record of the delivery cost actually incurred is kept for each. Before 1973, the retail sellers customarily stated the charge for delivery of these items from the supplier to them separately from the "price," and did not collect tax on the amount of such charges. The amount separately stated as the delivery charge was the delivery cost actually incurred.

The Comptroller presented evidence to show that as a matter of administrative interpretation, charges for delivery from a supplier to a retail seller, even if stated separately, were considered to be a part of the "price" to the buyer and to be taxable. The Assistant Director of the Retail Sales Tax Division, who had been employed by that division for approximately 24 years, said:

> "We have always felt that inbound freight [the charge for delivery from the supplier to the retail seller] was not one in connection with the retail sales. Retail sales is one between a vendor and his

customer. . . . We have always felt that inbound freight transactions between the manufacturer or supplier and the vendor, we feel that a retail sale or the exclusion in 324 (i) (4) is for a retail sale between the vendor and his customer."

He conceded that the Comptroller had never promulgated any formal regulation nor publicized this interpretation in any way. Moreover, he testified that he was unaware of any audits, previous to the ones here in question, which resulted in a deficiency assessment for a charge for delivery from a supplier to a retail seller. Indeed, the only audit he could remember relating to such a charge occurred approximately 15 to 18 years earlier. It involved a "catalogue order store chain" which added to the price quoted in the catalog a separately stated charge for delivery from the supplier to the catalog order store and collected from the buyer a tax on the total amount. He maintained that catalog order store chains, such as "Sears, Mongtomery Ward, Speigels, [and] J. C. Penney," have "always followed the policy" although he did not "have any idea how they became informed of the policy." He stated that on a number of occasions customers of such stores had called him to protest the tax and that he had always informed the protesting customers that the tax was in accord with administrative policy.

The tax court found that the meaning of section 324 (i) (4) was plain and unambiguous. That court pointed out that article 81, sections 324 (d) [2] and 324 (f) [3] provide "separate and

---

2. Art. 81, § 324 (d) (1975 Repl. Vol.) provides in pertinent part:

"'Sale' and 'selling' mean any transaction whereby title or possession, or both, of tangible personal property is or is to be transferred by any means whatsoever for a consideration . . . by a vendor to a purchaser. . . ." (Emphasis added.)

distinct definitions of 'sale' and 'retail sale' " and that the terms "sale" and "retail sale" both appear in section 324 (i) (4). It held that "[t]he plain meaning of this statute requires us to conclude that freight and delivery charges from a [supplier] to a retailer are not included in the price of the article transferred in the retail sale where such charges are separately stated."

The Circuit Court for Baltimore County (circuit court) affirmed. We issued a writ of certiorari to the Court of Special Appeals before consideration by that Court. With respect to some of the parties, we reach the same result as did the tax court, although for somewhat different reasons, and as to these parties we shall affirm. As to the remaining parties, we shall vacate without affirmance or reversal and remand for further proceedings in the tax court.

The Comptroller initially contends that the tax court and the circuit court erred when they concluded that the meaning of section 324 (i) (4) is plain and unambiguous and that the term "sale" as used in that section means "sale" and does not mean "retail sale." He agrees that the meaning of that section is plain and unambiguous, but argues that for various reasons the term "sale" as used in that section means "retail sale." He concludes that a charge for delivery from the supplier to the retail seller cannot be excluded from the "price" of an item sold in a retail sale.

The Comptroller alternatively contends that if the meaning of section 324 (i) (4) does not plainly establish that the term "sale" as used in that section means "retail sale," then the meaning of that section is, at least, ambiguous. He asserts that although sections 324 (d) and 324 (f) provide different definitions of the terms "sale" and "retail sale," when the term "sale" is used in various other sections of the Act, its context indicates that the term "retail sale" is meant. *See* art. 81, §§ 325, 326, 328, 329, 332, 334, 347, 364. He maintains that under these circumstances, the meaning of the term "sale"

---

tangible personal property to be produced for sale or in the generation of electricity, or (iii) to use or incorporate the property so transferred as a material or part, or other tangible personal property to be produced for sale by manufacturing, assembling, processing or refining." (Emphasis added.)